IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

TYLITHA DAVIS                                                    PLAINTIFF

V.                                        NO. 12-2228

CAROLYN W. COLVIN,[1]
Acting Commissioner of the Social Security Administration          DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Tylitha Davis, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claims for child's insurance benefits, a period of disability, and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

Plaintiff filed her application for children's insurance benefits and DIB on April 9, 2009, alleging disability since July 1, 2004, due to: hepatitis C; depression; anxiety disorder; bipolar disorder; chronic mental impairment; Brown syndrome; organic mental disorder; schizophrenia; paranoid and other psychotic disorders; affective disorder; personality disorder; and substance addiction disorder. (Tr. 68, 73). An administrative hearing was held on May 5, 2011, at which Plaintiff appeared with counsel, and she and her mother testified. (Tr. 1,288-1,364).

By written decision dated July 22, 2011, the ALJ found that Plaintiff was born on August

---

[1]Carolyn W. Colvin, has been appointed to serve as acting Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

-1-

17, 1982, and had not attained age 22 as of July 1, 2004, the alleged onset date; that prior to

attaining age 22, Plaintiff had the following severe impairments: bipolar I disorder, borderline

personality disorder, posttraumatic stress syndrome, and polysubstance abuse; and that Plaintiff

continued to have the same severe impairments. (Tr. 14).  However, after reviewing all of the

evidence presented, the ALJ determined that Plaintiff did not, nor did she prior to attaining age

22, have an impairment or impairments that met or equaled the level of severity of any

impairment listed in the listing of Impairments found in Appendix I, Subpart P, Regulation No.

4. (Tr. 14).  The ALJ found that, based on all the impairments, including the substance abuse

disorders, Plaintiff had, and had prior to age 22, retained the residual functional capacity (RFC)

to:

> perform a full range of work at all exertional levels but with the following
> nonexertional limitations: the work should be limited to simple, routine,
> and repetitive tasks, in a work environment free of fast paced production
> requirements, involving only simple, work-related decision, with few, if
> any, work place changes. The work should include not more than
> occasional interaction with the public and co-workers. The claimant is
> markedly limited in her ability to concentrate, persist, or maintain pace.

(Tr. 16).  With the help of a vocational expert (VE), the ALJ found that there were no jobs that

existed in significant numbers in the national economy that Plaintiff could perform, and a finding

of "disabled" was therefore appropriate under the framework of section 204.00 in the Medical-

vocational guidelines. (Tr. 18-19). The ALJ further found that if Plaintiff stopped the substance

use, the remaining limitations would cause more than a minimal impact on the Plaintiff's ability

to perform basic work activities; therefore, Plaintiff would continue to have a severe impairment

or combination of impairments .  However, the ALJ further found that if Plaintiff stopped the

substance use, Plaintiff would not have an impairment or combination of impairments that met

AO72A
(Rev. 8/82)

or medically equaled any of the impairments listed in the listings. (Tr. 19).

The ALJ also found that if Plaintiff stopped the substance use, the Plaintiff would have the RFC to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: the work should be limited to simple, routine, and repetitive tasks, in a work environment free of fact paced production requirements, involving only simple, work-related decision, with few, if any, work place changes. The work should include no more than occasional interaction with the public and co-workers.

(Tr. 21). The ALJ then found that if Plaintiff stopped the substance use, considering Plaintiff's age, education, work experience, and RFC, there would be a significant number of jobs in the national economy that Plaintiff could perform, such as production assembly workers (metal furniture assembler, lamination assembler, and hardware assembler) and hand packers (shoe packer, shot bagger, and bottle line attendant). (Tr. 24).  The ALJ concluded that because the Plaintiff would not be disabled if she stopped the substance use, Plaintiff's substance use disorders were a contributing factor material to the determination of disability and thus, Plaintiff had not been disabled within the meaning of the Act at any time from the alleged onset date through the date of the decision. (Tr. 24).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied the request on August 7, 2012. (Tr. 3-5). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed briefs and this case is before the undersigned for report and recommendation. (Docs. 13, 14).

The Court has reviewed the entire 1,364 page transcript. The complete set of facts and arguments are presented in the parties' briefs, and is repeated here only to the extent necessary.

I.    **Evidence Presented:**

Plaintiff was born in 1982, and the earliest medical records in this matter go back to 1997, when Plaintiff was referred for psychological assessment by school personnel. (Tr. 829-836). At that time, she was diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood; Reading Disorder; Disorder of Written Expression (Spelling); and Rule out subtle attention deficit disorder. (Tr. 836). Plaintiff complained of headaches in 1997 as well. (Tr. 136-137).

On January 8, 1998, an MRI of Plaintiff's brain was normal (Tr. 354), and on February 9, 1998, Dr. Russell W. Swann, an ophthalmologist, gave a tentative diagnosis of Brown's Syndrome. (Tr. 353). Plaintiff continued to complain of headaches, and on March 19, 1999, was seen by Dr. Randy C. Gardell at Central Texas Neurological Associates. (Tr. 394). Dr. Gardell noted that Plaintiff had a history of depression, had been on Prozac in the past, and indicated that Prozac and Elavil helped some. (Tr. 394). At that time, Plaintiff was not going to school, and was going to get her GED. (Tr. 394). Plaintiff was assessed with mixed headaches with significant vascular component; history of Brown's Syndrome involving the left eye; and history of depression. (Tr. 396).

In 2000, Plaintiff continued to suffer from migraine headaches, and on June 16, 2000, Dr. James T. Graham, Plaintiff's treating physician, assessed Plaintiff with asthma, well controlled; migraine headaches; folliculitis of the legs; multiple insect bites; and encouraged her to discontinue her tobacco use. (Tr. 721).

On September 6, 2000, Plaintiff saw Dr. Graham for follow up on her depression and "intermittent explosive disorder." (Tr. 716). She reported that she thought Serzone was helping

-4-

a little and said the only way she could calm her nerves was by smoking marijuana daily. (Tr. 716). Dr. Graham noted that Plaintiff actually went into a "tirade" in the exam room, stating that marijuana was better for her than any of the medications he had given her and that it was not addicting and had no harm. (Tr. 716). Dr. Graham concluded that secondary to his inability to help Plaintiff and the extremely dependent nature of his relationship with her and her relationship with her mother, it would be in Plaintiff's best interest that she seek another provider for her health care. (Tr. 714). He was going to follow through with a referral to a psychiatrist, as he thought she clearly needed one. (Tr. 714).

During 2001, Plaintiff complained of pain in her right lower quadrant, and on February 15, 2001, a CT scan of her abdomen and pelvis revealed probable cavernous hemangioma in the liver, some slightly mottling seen in the right kidney, presumably secondary to infection in the right kidney, and small cysts in both ovaries. (Tr. 764).

By August 31, 2001, Plaintiff was complaining of symptoms of depression and anxiety, and was assessed by Dr. Graham with bipolar disorder and hypomanic phase, and was admonished about any further smoking of cigarettes or marijuana. (Tr. 699).

On October 30, 2001, Plaintiff reported to Dr. Graham that although she had been doing much better, she had started to feel very bad again, and that she did not want to hurt herself, but had thought considerably about going back to substance abuse. (Tr. 696). She had been clean from cocaine abuse for approximately five months, but continued to abuse tobacco. (Tr. 696). Dr. Graham assessed Plaintiff with bipolar disorder, still poorly controlled, and was going to refer her to a psychiatrist. (Tr. 696).  Two months later, on December 21, 2001, Plaintiff again saw Dr. Graham and said she had been doing heroin for a week and also used Ecstacy,

-5-

marijuana, and cocaine.  (Tr. 693). Dr. Graham then assessed her with multiple drug abuse and borderline personality. (Tr. 693).

In 2002, Plaintiff continued to abuse drugs, and on February 21, 2002, Dr. Graham suggested that she get into the methadone clinic in "Temple" or go to "DePaul" for help. (Tr. 690). On July 10, 2002, Plaintiff went to Fairview-University Medical Center ("Fairview"), to be treated for her opiate dependence. (Tr. 1,282).  Upon admission, she admitted to a several-year history of addiction, and was assessed with opiate dependence, and benzodiazepines dependence. (Tr. 1,283).  The impression at that time was: alcohol dependence; cannabis dependence; hallucinogen abuse; cocaine dependence; opioid dependence; sedative dependence; and nicotine dependence. She was also reported as being homeless. (Tr. 1,285). Plaintiff stated that she had been unemployed for quite some time, and that it was entirely due to her chemical use. (Tr. 1,285). It was recommended that she enter the Inpatient Program for detoxification and stabilization. (Tr. 1,286).   Plaintiff was discharged from Fairview on July 18, 2002, with a diagnosis of polysubstance dependence; opiate dependence; and opiate withdrawal. (Tr. 1,282).

On April 2, 2003, Plaintiff was again admitted to Fairview, and was diagnosed as follows:

|         |                                        |
|---------|----------------------------------------|
| Axis I: | Major depression, recurrent, severe    |
|         | Opiate dependence                      |
|         | Polysubstance Dependence               |
| Axis II: | Borderline personality disorder traits |
| Axis III: | See Medical dictation                 |
| Axis IV: | Psychosocial stressors: severe         |
| Axis V: | Current GAF - 35                       |

(Tr. 1,276).  In an April 11, 2003 report from Fairview, it was reported that Plaintiff had gone to the emergency room on April 4, 2003, with suicidal thoughts,  having a plan to overdose on

-6-

heroin or cut her wrists. (Tr. 1,253). Her history of addiction was clearly set forth in the medical record.  She first drank alcohol at age 12 and her last use was six months prior. She first used marijuana at age 13 and her last use was one week prior. She first used cocaine at age 15 and her last use was at age 18. She first used crack cocaine at age 17, and her last use was three to four days prior.  (Tr. 1,253). She reported using ½ to 1 gram of heroin daily intravenously and her last use was on April 1, 2003. She also reported that she had been selling her prescription medication to obtain more heroin, and smoked one pack of cigarettes per day. (Tr. 1,254).  Plaintiff was placed on the Opiate Withdrawal Protocol and monitored.  (Tr. 1,275).  Her condition gradually began to improve, and she completed detoxification. She was discharged on April 11, 2003, to Lodging Plus at Fairview Recovery Services, for chemical-dependency treatment. (Tr. 1276)..  Plaintiff was discharged on April 24, 2003, and acknowledged that she continued to use chemicals, despite negative consequences in many areas of her life. (Tr. 1,268). Plaintiff shared the events leading up to her relapse after her recent treatment in the fall of 2002, and acknowledged that she did not follow through with attending any 12-step groups, and did not follow aftercare recommendations. (Tr. 1,269).  Plaintiff's relapse potential was considered significantly high, given the fact that Plaintiff continued to want to do things her way. (Tr. 1,269). It was reported that Plaintiff had a tendency to sabotage situations that would benefit her, and that a complication for Plaintiff was her self-centeredness and her quick behavior to place herself in the role of the victim. (Tr. 1,269). The prognosis for Plaintiff was given as extremely poor, given the fact that she continued in the same behavior and expected different outcomes. (Tr. 1,270).

On April 18, 2004, Plaintiff presented to the Washington Regional Medical Center

-7-

emergency room with the Fayetteville Police Department, over a possible sexual assault. (Tr. 146).  Plaintiff had been drinking all night and took a Xanax, and had bruises on both hands and shins. (Tr. 146). The police reported that Plaintiff stated she needed something for anxiety. (Tr. 147). Plaintiff was diagnosed with possible sexual assault; bruises on hands; and respiratory tract infection. (Tr. 148).

On November 19, 2004, Plaintiff presented herself to the Family Practice Center, where she was seen by Dr. David Myers. (Tr. 556). Plaintiff stated she hoped she could receive some psychiatric evaluation. Plaintiff had just been released from jail, where she had been held for problems dealing with marijuana use. Plaintiff stated that she self medicated with alcohol and marijuana, and that her mental status had been controlled in the past with Xanax and Clonopin, but most recently her anxiety had been controlled with Zyprexza. (Tr. 556).  Dr. Myers reported that Plaintiff's case was discussed at length with two other physicians, and that it was decided not to give Plaintiff any Xanax, Clonopin, or other psycho active drugs at that time, secondary to her drug abuse.  Plaintiff then stated that she would simply control her anxiety and depression with alcohol or marijuana until she could seek "psychiatric behavior." (Tr. 557).

On November 22, 2004, Plaintiff was seen at Heart of Texas MHMR. (Tr. 320). She was diagnosed with substance-induced anxiety disorder; cannabis abuse; alcoholic abuse in early partial remission; and heroin dependence in sustained full remission. (Tr. 321). Plaintiff was still using marijuana at that time. (Tr. 322). Although Plaintiff was encouraged to seek counseling and drug treatment, she indicated she was not interested. (Tr. 322).  Plaintiff then went to Dr. Graham on November 23, 2004, complaining of anxiety symptoms. Dr. Graham reported that he was going to refer her to Dr. Bock Morris for further evaluation and medication adjustment.

-8-

(Tr. 683).

On December 28, 2004, Plaintiff saw Oscar O'Neill at Family Practice Center, and indicated that she had enrolled in the Methadone program at Temple, and was going there every day. (Tr. 561). She reported she felt much better and that her anxiety had decreased, but that Xanax was not enough to feel completely fine. (Tr. 561).

On February 27, 2005, Plaintiff presented herself to Providence Health Center, where they removed a broken hypodermic needle from Plaintiff's arm. (Tr. 675).

On March 23, 2005, Plaintiff was presented to Providence Health Center, upset and screaming that she did not want to be admitted, wanted cigarettes, and did not want to kill herself. Her mother had brought Plaintiff in because Plaintiff said she was going to kill herself. (Tr. 327). Plaintiff was diagnosed with adjustment disorder with depressed mood.

On March 24, 2005, when Plaintiff went to Family Practice Center for a refill of Xanax, Dr. Wes Acker switched Plaintiff's medication to Valium, although Plaintiff was extremely unhappy with the change. (Tr. 572). Throughout the rest of 2005, Plaintiff continued to visit the Family Practice Center. On June 15, 2005, a report from the Family Practice Center reveals that Plaintiff denied drug use, but presented as "drugged" (slurred speech, difficulty staying on the subject). (Tr. 581). On August 25, 2005, Plaintiff reported that she was doing well on Valium and Effexor. (Tr. 587). She had been out of Valium for a week and said it had been hard on her. (Tr. 587).

After the relevant time period (in this case, July 1, 2004 through September 30, 2005), on February 15, 2006, Plaintiff presented to the Family Practice Center for follow-up, and had been on Methadone treatment for over a year. (Tr. 600). Several weeks prior, Plaintiff decided

AO72A
(Rev. 8/82)

to quit it cold turkey and was having many problems, including uncontrolled diarrhea and problems with her bowels. (Tr. 600). On March 6, 2006, Plaintiff reported she stopped taking Effexor because of the extreme cost, and was unable to hold down Valium. (Tr. 605). She reported that she did attempt to use cocaine recently, though she "missed" the vein. (Tr. 606). Plaintiff was unwilling to get further help, just wanted to leave Waco, Texas, and her parent's home. (Tr. 606). Also on March 6, 2006, Plaintiff presented to the emergency room of Providence Health Center because of a suicide attempt. (Tr. 617). She had laid behind her mother's car to get her mother's attention. (Tr. 617). Plaintiff was sent to the DePaul Evaluation Center for further stabilization. (Tr. 611).  Plaintiff was reported as positive for cocaine and benzodiazepines, and reported usual daily alcohol abuse, despite having Hepatitis C and previous consequences.  (Tr. 611).  Plaintiff was assessed as follows:

| | |
|---|---|
| Axis I: | Depression nos |
| | Rule out major depressive disorder |
| | Alcohol dependence |
| | Polysubstance abuse |
| | V Code Family Circumstance problems |
| Axis II: | History of borderline personality disorder with histrionic traits |
| Axis III: | Recent fever unknown origin |
| | Increased white blood cells in urine |
| | History of hepatitis |

(Tr. 611).

        In late April and May of 2006, Plaintiff spent several days in treatment at Decision Point, where it was reported that her #1 drug of choice was methadone and #2 drug of choice was cocaine. (Tr. 1,130).  By May 12, 2006, Plaintiff was discharged from Decision Point for non-compliance with treatment, non-compliance with agency rules, and she no longer desired

AO72A
(Rev. 8/82)

services. (Tr. 1,199).

Plaintiff spent a good part of 2007 in the Arkansas Department of Correction, and was released on August 17, 2007.  (Tr. 451).  While in jail, on January 29, 2007, Plaintiff was assessed by Dr. Peter M. Edwards, a psychiatrist at Southeast Community Corrections, as follows:

| | | |
|---|---|---|
| Axis I: | Substance dependence to include benzodiazepines. Possible cocaine, methylamphetamine and opiates as well. | |
| Axis II: | Possible borderline personality traits or disorder | |
| Axis III: | Noncontributory, as least at this point in time. | |

(Tr. 447). On February 12, 2007, Plaintiff again saw Dr. Edwards, and was smiling and friendly. (Tr. 444). She did not appear anxious, and the assessment was substance dependence as well as possible borderline personality traits. (Tr. 444). Dr. Edwards reported that she seemed to be stable enough at that time. (Tr. 444).

On August 29, 2008, Plaintiff presented to Pat Walker Health Center, where she stated that she had not taken any mental health medications for about a year and a half and that she had become very, very anxious.  (Tr. 513). She reported that she had attempted suicide with a full bottle of over-the-counter sleeping pills, but nothing in particular happened. (Tr. 513).  She was assessed with depression and anxiety by history. (Tr. 513).

On September 13, 2008, Plaintiff presented to Washington Regional Medical Center emergency room via EMS, in police custody. (Tr. 171).  She had been arrested for her third driving under the influence charge, went to jail, had some "passing out spells," and was sent to the emergency room. (Tr. 172). She was diagnosed with acute alcohol intoxication. (Tr. 174).

Plaintiff again spent several days at Decision Point in October of 2008 for detoxication,

-11-

and on November 6, 2008, Plaintiff was diagnosed as follows:

| Axis I: | Opioid dependence |
| | Alcohol dependence |
| | Cannabis abuse |
| | Cocaine abuse |
| Axis II: | Depressive disorder |
| | Anxiety disorder |
| Axis III: | Hep - C |
| | Cervical cancer |
| Axis IV: | problems with primary support group, social environment, occupational problems, economic problems, problems accessing healthcare services, problems interacting with legal system. |

(Tr. 905, 994). On December 3, 2008, Plaintiff was discharged from Decision Point for non-compliance with agency rules. (Tr. 1,002). It was reported that Plaintiff had allowed a male client in her room during the Thanksgiving holiday week and the prior week, along with other peers, and she was escorted to the front lobby and helped with her personal belongings. (Tr. 1,038). It was noted that this was Plaintiff's second time in residential treatment, and that she would have to get permission from the clinical director if she returned to treatment. (Tr. 1,028).

On February 28, 2009, Plaintiff presented to Washington Regional Medical Center with her mother, and her mother reported that Plaintiff had been struck in the face, and did not recall what happened. (Tr. 158). Her mother also reported that Plaintiff was hearing voices and seeing things that were not there. (Tr. 158). At that time, Plaintiff reported smoking ½ pack of cigarettes per day for half her life, drank ½ pint a day for 1 ½ years, had "past use of heroin and meth," and present use of marijuana. (Tr. 159). Her diagnosis was facial contusion; alcohol withdrawal, and subconjutival hemorrhage. (Tr. 161). CT Scans of her head revealed no acute intracranial process and no acute fracture. (Tr. 167-168).

-12-

On June 8, 2009, Patricia J. Walz, Ph.D., of Consulting Psychology of Western Arkansas, Inc., conducted a Mental Diagnostic Evaluation of Plaintiff. (Tr. 198-204). Plaintiff advised Dr. Walz that she had Hepatitis C and HPV, and was in stage two or three and needed to have surgery because she had the beginning of cervical cancer. (Tr. 200). She advised that the last alcohol she had was a month and a half prior, when she drank a half a pint of whiskey, which she described as "not that much." Prior to that she was drinking a half a gallon a day. (Tr. 201). Plaintiff also said that she last used illegal drugs when she smoked some pot about a month and a half previously. (Tr. 201). Plaintiff's intellectual functioning was thought to be in the average range. Dr. Walz assessed Plaintiff as follows:

| | |
|---|---|
| Axis I: | Bipolar I Disorder, most recent episode hypomanic. Posttraumatic Stress Disorder, Chronic Polysubstance Abuse in Partial Remission |
| Axis II: | Borderline Personality Traits |
| Axis V/GAF | 40 to 45 |

(Tr. 203). Dr. Walz opined that Plaintiff's social skills were impaired by her rambling manner and that she had difficulty staying on task. (Tr. 203). Dr. Walz recommended that Plaintiff have supervision, especially given her substance abuse. (Tr. 204).

On July 27, 2009, Dr. Winston Brown, a non-examining consultant, completed a Mental RFC Assessment (current evaluation). (Tr. 215-218). Dr. Brown found Plaintiff was moderately limited in seven categories and not significantly limited in twelve categories. (Tr. 217). He also found that Plaintiff was able to perform work where interpersonal contact was incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required was simple, direct and concrete (unskilled). (Tr. 217). Dr. Brown also completed a Psychiatric Review Technique form on July 27, 2009,

-13-

reporting that Plaintiff had a mild degree of limitation in restriction of activities of daily living, and a moderate degree of limitation in difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (Tr. 229).  In his Psychiatric Review Technique form regarding assessment as to September 30, 2005, Dr. Brown found Plaintiff had a mild degree of limitation in all three functional limitation areas and no episodes of decompensation, and therefore concluded Plaintiff's mental impairments were not severe as of the date last insured. (Tr. 243, 245).

On October 23, 2009, Plaintiff was admitted to St. Vincent Health System for assaultive behavior. (Tr. 367, 376).  She had been threatening to kill her father and then herself. Police were called to her house and apprehended Plaintiff and brought her to the emergency room, where she was hospitalized for psychiatric stabilization. (Tr. 367). It was reported that Plaintiff had been noncompliant with medications and outpatient treatment. (Tr. 367).  Plaintiff was discharged to her parents on October 27, 2009, and was diagnosed as follows:

| | |
|---|---|
| Axis I: | Bipolar disorder, alcohol abuse |
| Axis II: | none |
| Axis III: | none |
| Axis IV: | Stressors, primary support, family, social environmental |
| Axis V: | GAF highest level in the past year is 53, level on admission is 16, level on discharge is 50. |

(Tr. 368).   It was reported that Plaintiff came to the hospital under a 45-day court order. (Tr. 370). Plaintiff reported that she continued to drink some alcohol but not as heavily as in the past. (Tr. 370).

Plaintiff was thereafter treated by Western Arkansas Counseling and Guidance Center for  the remainder of 2009, and in a Diagnostic Evaluation dated November 12, 2009, Plaintiff

-14-

was reported as working at a store in Ft. Smith, smoked one to two packs of cigarettes per day, and was taking Depakote, Traxodone, and Clonazepam. (Tr. 249-250).

On February 12, 2010, Plaintiff presented herself to Washington Regional Medical Center for evaluation of alcohol abuse, narcotic abuse, and benzodiazepine abuse. (Tr. 454). Her condition was reported as exacerbated by running out of narcotics and benzos three to four days prior. (Tr. 454). Plaintiff was diagnosed with suicidal ideation and drug withdrawal syndrome. (Tr. 458). Plaintiff requested "detox from opiates and ETOH," was irritable and agitated, and reported drinking a pint of peppermint schnapps. (Tr. 461, 465). She reported feeling irritated, had anxiety, and reported that she would hurt herself and other people if she did not receive help. (Tr. 465).

On February 22, 2010, Plaintiff presented to St. Edward Mercy Medical Center, and the provisional diagnosis was migraine headache and opiate withdrawal. (Tr. 1,246).

For a good part of 2010, Plaintiff saw Dr. Juan Hughes at Hughes Medical Care, and on May 28, 2010, Plaintiff reported to Dr. Hughes that she had been doing well. (Tr. 383). She was in the process of subaxone treatment. (Tr. 385). Dr. Hughes opined that Plaintiff was disabled due to mental condition and at that time had not been keeping busy enough.  Plaintiff denied the use of any opiates at that time. (Tr. 385).  On June 23, 2010, Dr. Hughes reported that Plaintiff was doing well on her present medical regimen - had used some THC and was advised against this, and was to keep active. (Tr. 387-388).  On July 20, 2010, Dr. Hughes reported that Plaintiff appeared to be doing well from the opiate addiction component. (Tr. 389).

During the latter part of 2010, Plaintiff saw Dr. Donald Chambers, a psychiatrist.  On July 21, 2010, Dr. Chambers performed an Initial Evaluation. (Tr. 518).  He noted that over the

-15-

weekend, when she had a blackout, she said she was drinking by herself and her nerves had been on edge.(Tr. 518).

On October 21, 2010, Plaintiff reported to Dr. Chambers that she was "at the end of my rope." (Tr. 525).  On November 4, 2010, Plaintiff reported to Dr. Chambers that she had been a mess that week, and was reported as being anxious and agitated. (T4. 526).

As of December 1, 2010, Plaintiff was reported as doing better and had been placed on a new mood stabilizer, and reported smoking THC, but no use of other opiates. (Tr. 390). Her urine drug screen showed some THC and questionable opiate use. (Tr. 391). Dr. Hughes indicated he discussed it at length with Plaintiff and advised her that she needed to avoid all types of drugs, including marijuana, and that she would be tested regularly. (Tr. 391).

On March 9, 2011, Plaintiff reported to Dr. Hughes that she was arrested for shop lifting and spent three days in jail. (Tr. 392). She stated she did not get all of her medications during this time. (Tr. 392). By April 8, 2011, Dr. Hughes noted that Plaintiff had been started on Abilify by her psychiatrist, and that her mood had stabilized. (Tr. 393). Dr. Hughes opined that Plaintiff was doing well and was commended for continuing to try, and he encouraged her to continue her present regiment of care. (Tr. 393). Regarding her disability, Dr. Hughes stated:

> it is my professional medical opinion that Ms. Davis underlying psychological conditions; despite her history of substance abuse - will make it highly unlikely for her to maintain any type of gainful employment in the foreseeable future.

(Tr. 393).

Dr. Hughes completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on May 12, 2011. (Tr. 1,229-1,230). Dr. Hughes stated that his professional

-16-

opinion was that Plaintiff's psychiatry and addictive illnesses would prevent Plaintiff from sustaining employment for any prolonged length of time. (Tr. 1,230).

Dr. Chambers also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on May 22, 2011, wherein he found that Plaintiff had an ingrained bipolar disorder which had contributed to years of severe mismanagement of her personal life. (Tr. 1,228). He reported that she was improving with treatment but that her adaptive abilities were seriously impaired. (Tr. 1,228).

### III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one

-17-

year and that prevents her from engaging in any substantial gainful activity.  Pearsall v.

Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A),

1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results

from anatomical, physiological, or psychological abnormalities which are demonstrable by

medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3),

1382(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for

at least twelve consecutive months.

       The Commissioner's regulations require him to apply a five-step sequential evaluation

process to each claim for disability benefits: (1) whether the claimant had engaged in substantial

gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or

mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled

an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing

past relevant work; and (5) whether the claimant was able to perform other work in the national

economy given her age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final

stage is reached does the fact finder consider the Plaintiff's age, education, and work experience

in light of her residual functional capacity (RFC).  See McCoy v. Schweiker, 683 F.2d 1138,

1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

**IV.    Discussion:**

       Plaintiff raises the following issues on appeal: 1) The ALJ failed to develop the record

as to the Plaintiff's RFC; 2) The ALJ erred as it related to his findings of severe impairments;

3) The ALJ erred as it relates to his assessment of credibility; and 4) The ALJ largely ignored the

Plaintiff's limitations set out in the RFC of the Plaintiff's treating psychiatrist and primary care

-18-

physician. (Doc. 13).

**A.    Credibility Assessment:**

Plaintiff contends that the ALJ failed to properly assess credibility as it related to Plaintiff's severe psychological impairments. The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

In this case, the ALJ followed the analytical framework prescribed by the regulations and made detailed factual findings about Plaintiff's mental impairments and substance abuse. The ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC assessment. (Tr. 22). He explained this by pointing to her continuing allegations of disabling symptoms when the medical records revealed that the medications had been relatively effective in controlling her symptoms; her refusal to take prescribed medications; her noncompliance with medications and outpatient treatment; and her continued use of substances. (Tr. 22-23). The ALJ also considered Plaintiff's daily activities, noting that Plaintiff was able to feed and dress herself and attend to

-19-

personal hygiene without assistance, prepare meals, perform general housekeeping tasks, assist in the care of family pets, do yoga, shop for needed items, handle a checkbook, use the internet, and go out alone. (Tr. 15).

The Court believes the ALJ provided good reasons for discrediting Plaintiff's testimony of functional limitations, and that there is substantial evidence to support the ALJ's credibility findings.

**A.    RFC Determination**:

RFC is the most a person can do despite that person's limitations.   20 C.F.R. §404.1545(a)(1).  It is assessed using all relevant evidence in the record.  Id.  This includes medical records, observations of treating physicians and others, and the claimant's own description of her limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).  The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "The ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC."  Id.

With respect to Plaintiff's first argument that the ALJ did not mention Plaintiff's GAF scores, which were all below 45,  "[t]he Eighth Circuit has rejected an argument that the ALJ's failure to discuss GAF scores requires reversal." Martin ex rel. RTDR v. Colvin, No. 4:12-cv-

00422, 2013 WL 4591374 at *7 (Aug. 28, 2013), citing <u>Wright v. Astrue</u>, 489 Fed. Appx. 148, 149 (8th Cir. 2012)(unpublished).

Furthermore, in determining Plaintiff's RFC, the ALJ afforded some, but not substantial weight to the opinions of Plaintiff's treating physicians because, for the most part, Plaintiff did not seek care from any one treating physician for any significant length of time. (Tr. 17-18). He also noted that less weight was afforded based upon Plaintiff's manipulative personality and her motivation to misrepresent the facts to support her drug habit. (Tr. 18). The ALJ gave great weight to the opinion of Dr. Walz, as he found it to be consistent with the record as a whole. (Tr. 18). The ALJ also considered Plaintiff's mother's opinion, but afforded it less weight than the opinions offered by medical sources. (Tr. 18).

In determining Plaintiff's RFC if she stopped the substance use, the ALJ considered Plaintiff's medical history and medications. (Tr. 22). The ALJ noted Plaintiff's numerous incidents of non-compliance with her medications, as well as Plaintiff's continued use of substances, and gave little weight to the opinions of Dr. Hughes and Dr. Chambers.

The Court believes the ALJ was warranted in giving little weight to the Medical Source Statements of Dr. Hughes and Dr. Chambers, dated May 12, 2011 and May 22, 2011, respectively.   As noted by Defendant, Plaintiff had the burden of proving that she became disabled prior to turning age 22 (prior to August 17, 2004) for child's insurance benefits based on her father's earnings record, and prior to her date last insured (prior to September 30, 2005) for disability insurance benefits based on her own earnings record. Neither Dr. Hughes nor Dr. Chambers purport to offer an opinion about Plaintiff's mental functioning for the period at issue, which runs from July 1, 2004, through September 30, 2005.  In addition, the ALJ gave detailed

-21-

reasons as to why he afforded their opinions little weight.

Plaintiff next argues that the ALJ failed to include crucial information and limitations in the hypothetical questions to the VE.

As indicated by the Defendant, the ALJ's decision shows only one significant difference in Plaintiff's RFC with and without substance use - in the area of concentration, persistence, and pace. (Tr. 16, 21). With substance abuse, the ALJ found Plaintiff had marked limitations in concentration, persistence and pace. (Tr. 16). Without substance abuse, Plaintiff had moderate limitations in concentration, persistence, and pace. (Tr. 20). Therefore, the ALJ's limitation of Plaintiff contained in the RFC to simple, routine, and repetitive tasks, as well as an environment free of fast-paced production requirements, and few, if any, workplace changes, takes into account Plaintiff's moderate limitation in concentration, persistence and pace. (Tr. 21).

Therefore, the undersigned  believes the hypothetical the ALJ proposed to the VE fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole.  See Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).

Based upon the foregoing, the Court believes there is substantial evidence to support the ALJ's RFC determination.

**B.**     **Severe Impairments:**

Plaintiff contends that her medically-treated condition of depression is not mentioned.  An impairment is severe within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.   20 C.F.R. §§ 1520(a)(4)ii), 416.920(a)(4)(ii).  An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities

-22-

that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. §§ 404.1521, 416.921.  The Supreme Court has adopted a "de minimis standard" with regard to the severity standard.  <u>Hudson v. Bowen</u>, 870 F.2d 1392, 1395 (8ᵗʰ Cir. 1989).

Although the ALJ did not find that Plaintiff had a severe impairment of depression, he did find that she had the severe impairments of bipolar I disorder, borderline personality disorder, posttraumatic stress syndrome, and polysubstance abuse.  The Court believes that decision was supported by substantial evidence.  "Bipolar disorder is characterized by alternating manic episodes, in which the individual feels abnormally euphoric, optimistic, and energetic, and depressive periods, in which the individual feels sad, hopeless, guilty, and sometimes suicidal." <u>Harris v. Astrue,</u> No. 2:11-CV-00194-BD, 2012 WL 5036009 at *2 (E.D. Ark., Oct. 17, 2012) (quoting from Maria Basile & Laura Jean Cataldo, 1 <u>The Gale Encyclopedia of Mental Health</u> 211 (3d ed.)).  Clearly, the ALJ's discussions relating to Plaintiff's bipolar disorder took into account the depression that is inherent in an individual diagnosed with bipolar disorder. In addition, to the extent that the ALJ erred at Step Two by failing to find Plaintiff's depression a severe impairment, the error was harmless. "Courts frequently find that an ALJ's error at Step Two in failing to find a particular impairment severe does not require reversal where the ALJ considers all of a claimant's impairments in his or her subsequent analysis. <u>Hankinson v. Colvin</u>, No. 4:11-01-2183-SPM, 2013 WL 1294585 at *12 (E.D. Mo. Mar. 28, 2013).  Here, the ALJ clearly considered all of Plaintiff's mental limitations, including those related to depression. He discussed the fact that Plaintiff once stayed in her home for 140 straight days, and that Plaintiff reported wild mood swings and difficulty with relationships. (Tr. 17).  The ALJ adequately considered the limitations attributable to Plaintiff's depression, whether or not he found her

-23-

AO72A
(Rev. 8/82)

"depression" to be a severe impairment in addition to her bipolar I disorder, borderline personality disorder, posttraumatic stress syndrome, and polysubstance abuse. The ALJ's RFC included limitations in the same areas the Plaintiff attributed to depression, and any error at Step Two was therefore harmless. See id.

**IV.   Conclusion:**

The undersigned is satisfied that after considering all of the evidence under the substantial evidence standard, the ALJ "untangled" Plaintiff's history of substance abuse and mental illness with "sufficient clarity and detail" to support the finding that Plaintiff is not disabled apart from her substance abuse. See Vester v. Barnhart, 416 F.3d 886,891-92 (8th Cir. 2005)**.**

Accordingly, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 1st day of November, 2013.

/s/ Erin L. Setser
_____
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-24-